UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CHRISTOPHER DOLCE, SHINAIDE
MCALEAVEY-POLLEY, and SARAH
ECKE,

                Plaintiffs,

      v.

CONNETQUOT CENTRAL SCHOOL
DISTRICT, CONNETQUOT BOARD OF
EDUCATION, LYNDA G. ADAMS, REZA
KOLAHIFAR, JACLYN NAPOLITANO-
FURNO, LEE KENNEDY, MICHAEL
MORAN,

                Defendants.

**MEMORANDUM & ORDER**
24-CV-00622 (HG)

**HECTOR GONZALEZ**, United States District Judge:

Plaintiffs[1] bring this employment discrimination action regarding actions and policies

implemented by Defendants at the Connetquot Central School District (the "District"). ECF

No. 14 ¶ 1 (Amended Complaint). Plaintiffs assert 18 causes of action, which include: federal

claims of discrimination, retaliation, publishing discriminatory notices, sex-based harassment,

First Amendment violations, and Fourteenth Amendment violations; and state claims of

discrimination, retaliation, hostile work environment, circulating discriminatory statements, and

aiding and abetting discrimination. *Id.* ¶¶ 132–278. Currently pending before the Court is

Defendants' motion to dismiss the Amended Complaint. *See* ECF No. 24 (Motion to Dismiss).

Plaintiffs oppose, *see* ECF No. 41 (Opposition), and Defendants have filed a reply in further

---

[1]    New York LGBT Network, Inc., ("LGBT Network") was originally included as a
Plaintiff in this case. *See* ECF No. 14. However, that party was dismissed pursuant to a
stipulation of dismissal among the parties. *See* ECF No. 55 (Stipulation of Dismissal).
Accordingly, the Court does not address the parties' arguments with respect to whether LGBT
Network has standing in this case.

support of their motion, *see* ECF No. 42 (Reply).  For the reasons set forth below, Defendants'
motion is granted as to Plaintiffs' federal claims, and the Court declines to exercise supplemental
jurisdiction over Plaintiffs' state law claims.

## BACKGROUND

The Court "recite[s] the substance of the allegations as if they represent[] true facts, with
the understanding that these are not findings of the [C]ourt, as [I] have no way of knowing at this
stage what are the true facts."  *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d
Cir. 2021).[2]

Plaintiffs Christopher Dolce, Shinaide McAleavey-Polley, and Sarah Ecke, who are
"open members of the LGBTQ+ community," are employees of the District.  ECF No. 14 ¶¶ 30,
34.  They are also teachers and/or club advisors at Connetquot Central High School.  *Id.* ¶ 31.
During the relevant time period, Defendant Lynda G. Adams was the Superintendent of the
District and Defendant Reza Kolahifar was the Assistant Superintendent.  *Id.* ¶¶ 43, 46.
Defendant Jaclyn Napolitano-Furno was the President of the District's Board of Education (the
"Board"), and Defendant Lee Kennedy was a Trustee of the Board.  *Id.* ¶¶ 42, 49, 52.  Defendant
Michael Moran was the Principal of Connetquot Central High School.  *Id.* ¶ 55.

Plaintiff Ecke's classroom is the designated meeting space for the Gay Straight Alliance
("GSA") club at the school.  *Id.* ¶ 61.  On September 14, 2022, Defendants Adams, Napolitano-
Furno, and Kennedy conducted an unannounced inspection of Ecke's classroom.  *Id.* ¶ 60.  These
Defendants informed Ecke that if she did not remove the progress pride flag displayed in her
classroom, they would "implement a policy whereby not just the Progress Pride Flag, but *all*

---

[2]      Unless otherwise indicated, when quoting cases and the parties' papers, all internal
quotation marks, alteration marks, emphases, footnotes, and citations are omitted.  The Court
refers to the pages assigned by the Electronic Case Files system ("ECF").

Pride Flags, would be removed from the GSA Room."  *Id.* ¶ 62 (emphasis in original).  On September 16, 2022, Ecke told Plaintiffs Dolce and McAleavey-Polley about the potential new policy.  *Id.* ¶ 63.  On October 4, 2022, Dolce and Ecke emailed the Board requesting to meet with Board members "to discuss the issue of the pride flags" because they believed "any restriction on the flag would be detrimental to [the] students and costly to the [D]istrict."  *Id.* ¶ 65; ECF No. 41-1 (Oct. 4, 2022, Ecke Email).[3]

Later that day,[4] Defendant Kolahifar circulated an email to the school's faculty "remind[ing]" them of the District policy of not engaging "in any active political practices that would exclude any student or make any individual feel uncomfortable."  ECF No. 14 ¶ 73; ECF No. 14-2 at 1 (Oct. 4, 2022, Kolahifar Email).  Because this included "flags denoting political views," the email instructed that the "only flags that should be hung in a classroom or office are the American Flag and the [New York State] Flag," ("Political Practices Policy").  ECF No. 14-2 at 1.  On October 6, 2022, Defendant Adams sent another email to the faculty informing the staff that a particular teacher was asked to remove the progress pride flag from a classroom after students reported feeling uncomfortable about the flag being displayed.  ECF No. 14-3 at 1 (Oct. 6, 2022, Email).  The email also indicated that the District offered, in place of the flag, a sign that said, "This is a safe space to be who you are," but the teacher refused the offer.  *Id.*  The email further informed the staff that because this teacher refused to remove the flag, the District's preexisting "Policy 1310" now must be fully implemented.  *Id.*  "Policy 1310" "states

---

[3]     "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).  The Court therefore considers the exhibits attached to the Amended Complaint in considering Defendants' motion to dismiss.

[4]     The Amended Complaint incorrectly states that this email was sent on October 5, 2022. ECF No. 14 ¶ 73.

that school employees shall not engage in political activities on school premises." *Id.* Plaintiffs allege that Ecke was the teacher referenced in that email. ECF No. 14 ¶ 74. On October 7, 2022, Defendant Moran re-circulated the email detailing the Political Practices Policy to faculty and staff and directed all staff to "remove all non[-] American/NYS flags" by the end of the day. ECF No. 14-4 at 1 (Oct. 7, 2022, Email). Exempted from the policy were flags related to the curriculum taught in the classroom, "i.e. Italian Flag in Italian Class." *Id.* All pride flags and progress pride flags, including the two displayed in Ecke's classroom, were then removed from the District. ECF No. 14 ¶ 76. On October 11, 2022, the Board held a meeting during which the Political Practices Policy was discussed. *Id.* ¶ 77. During the meeting, Plaintiffs, along with others, attended a rally organized by LGBT Network, which opposed and protested the Political Practices Policy ("LBGT Rally"). *Id.* ¶ 78.

On October 15, 2022, Plaintiffs Dolce and McAleavey-Polley discovered that stickers on the doors to their classrooms that had depicted the pride flag had been replaced with stickers depicting the American Flag (the "Sticker Replacement Incident"). *Id.* ¶ 84. The next day, Dolce and McAleavey-Polley orally reported the Sticker Replacement Incident to Defendant Moran. *Id.* ¶ 85. A day later, Moran told Dolce and McAleavey-Polley that the student responsible for the Sticker Replacement Incident had been identified by surveillance footage and would be suspended for three days. *Id.* ¶ 91. Plaintiffs allege that they believe Defendant Adams overturned the decision to suspend the student on the following day. *Id.* ¶ 92. That same day, Moran circulated an email to the school's staff noting that "no 'flag stickers' can be placed on doors or windows of [the] classroom or office and need to be removed." ("Sticker Policy" together with the Political Practices Policy, the "District Policies"). ECF No. 14-5 at 1 (Oct. 18, 2022, Moran Email). Later that day, Plaintiff Dolce emailed Defendant Adams indicating that he

has been "heartbroken by the state of [the] [D]istrict." ECF No. 14-6 at 2 (Oct. 18, 2022, Dolce Email). Dolce explained that "[r]ainbows and pride flags ha[d] been present at Connetquot [High School] as long as [he could] remember," but recent events, including the "overturning of the relevant disciplinary matter," caused him to "no longer feel safe at Connetquot schools." *Id.* Dolce urged that the "most vulnerable students" needed help from Adams. *Id.* at 3.

On October 20, 2022, Plaintiffs reported the recent events to the Connetquot Teachers' Association ("CTA"). ECF No. 14 ¶ 100. Thereafter, the President of CTA, Tony Felicio, contacted Adams seeking clarification about the Sticker Policy. ECF No. 14-7 at 2 (Oct. 27, 2022, Email). Adams responded that "[s]tickers should not be placed on public property, unless they were purchased by the [D]istrict and placed specifically for a purpose." *Id.* Plaintiffs allege that "[f]lags, stickers and other forms of symbolic speech . . . had been permitted . . . for many years prior to the Removal Polices and the events complained of herein" and that for at least five years prior to the District Policies, teachers were permitted to express free speech by decorating their walls and doors of their classrooms. ECF No. 14 ¶¶ 103–04.

Plaintiffs allege that the District Policies were not strictly enforced, and that there were painted depictions of various flags that were permitted in the school parking lot. *Id.* ¶ 106(a). Some of the flags depicted included the "Blue Lives Matter flag, a Mexican flag . . ., a derivative of the American flag that included the year '1776,' and a neo-Nazi / neo-confederate flag." *Id.* There was also a French flag that hung in the French classroom, and professional sports team flags hung at the school. *Id.* ¶¶ 106(b), (e). Plaintiffs also allege other categories of speech were permitted such as: (i) the "acronym 'MAGA,' representing . . . President Donald Trump's campaign slogan 'Make America Great Again,'" painted in the school parking lot, *id.* ¶ 106(c); (ii) stickers on classroom doors and bulletins supporting organizations such as "Students Against

5

Drunk Driving," and "Anti-Bullying Club," *id.* ¶ 106(d); (iii) a "[p]rominent 9/11 Memorial display in the Oakdale Bohemia Middle School," *id.* ¶¶ 106(f), 112–13;[5] and (iv) religious jewelry such as "Christian Crucifix" worn by teachers, students and the District's staff, *id.* ¶ 106(g).

On February 17, 2023, graffiti was discovered on a wall at the school that said "F*ck Gays." *Id.* ¶ 108. The incident was investigated by the Suffolk County Police Department. *Id.* ¶ 109. Plaintiffs allege Defendants did not discipline the individuals who painted the graffiti, despite Defendants being aware that these individuals had painted other anti-LGBTQ graffiti on the walls of the school on three separate occasions. *Id.* ¶¶ 110–11.

Around May 2023, Plaintiff Ecke distributed permission slips to students of the GSA club in advance of an annual trip to the LGBT Youth Conference ("GSA Trip"). *Id.* ¶ 115. The trip was scheduled for May 22, 2023. *Id.* Five days before the deadline for the permission slips to be returned, and 12 days before the trip, Defendant Moran notified Plaintiff Ecke that a "new, and more detailed, permission slip was now required for students to go on the GSA Trip." *Id.* ¶¶ 117–18. On May 15, 2023, Defendant Moran sent a follow up email to Plaintiff Ecke reminding her that she needed to "send home an updated permission slip that included [the] full title and purpose of the trip." ECF No. 14-9 at 2 (May 15, 2023, Email). Plaintiffs allege that, even though the District told Ecke that other permission slips for different trips would require the same information, she was the only teacher in the District who was required to modify the permission slip. ECF No. 14 ¶¶ 124–26.

---

[5]    The Court takes judicial notice that Oakdale Bohemia Middle School is within the District. *See* Oakdale-Bohemia Middle School, Connetquot Central School District, https://perma.cc/AY7P-YW96 (last visited Apr. 9, 2025).

## **LEGAL STANDARD**

"In order to survive a motion to dismiss, a plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Emilee Carpenter, LLC v. James*, 107 F.4th 92, 99 (2d Cir. 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is plausibly alleged 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matzell v. Annucci*, 64 F.4th 425, 433 (2d Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In making this assessment, the court must accept as true all of the factual allegations set out in plaintiffs['] complaint, draw inferences from those allegations in the light most favorable to plaintiff[s], and construe the complaint liberally." *VR Glob. Partners, L.P. v. Petróleos de Venezuela, S.A.*, No. 24-1176-cv, 2024 WL 4891271, at *2 (2d Cir. Nov. 26, 2024).

## **DISCUSSION**

### I.     **Federal Discrimination Claims**

Employment discrimination claims are analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Robinson v. MSG Ent. Grp., LLC*, No. 23-cv-9366, 2024 WL 3938361, at *4 (S.D.N.Y. Aug. 26, 2024). The test requires Plaintiffs to first establish a *prima facie* case of discrimination. *Id.* "After a plaintiff makes this prima facie showing, it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." *Id.* On a motion to dismiss, Plaintiffs need only plead sufficient facts to establish a *prima facie* case, and the second and third steps of the *McDonnell-Douglas* framework are not considered. *Id.* at *5. Plaintiffs'

federal discrimination claims are brought under Title VII of the Civil Rights Act of 1964 ("Title VII").  ECF No. 14 ¶¶ 132–46 (Title VII); 156–60 (Discriminatory Notice).

      *A.      Title VII - Discrimination*

"Title VII prohibits an employer from discriminating in 'compensation, terms, conditions, or privileges of employment, because of an individual's race, color, religion, sex or national origin.'" *Littlejohn v. City of New York*, 795 F.3d 297, 320 (2d Cir. 2015) (quoting 42 U.S.C. § 2000-e(2)(a)(1)).  "The Supreme Court has held that 'homosexuality and transgender status are inextricably bound up with sex,' and that 'to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex.'" *Cruz v. Bernstein Litowitz Berger & Grossman LLP*, No. 20-cv-8596, 2023 WL 2691456, at *5 (S.D.N.Y. Mar. 29, 2023) (quoting *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660–61 (2020)).

To state a prima facie case of discrimination under Title VII, Plaintiffs must allege that: (1) they are members of a protected class; (2) they were qualified for the position; (3) they suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.  *Littlejohn*, 795 F.3d at 311; *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012).  The parties do not dispute that Plaintiffs, as members of the LGBTQ+ community, are members of a protected class.  Nor do the parties dispute that Plaintiffs were qualified for their positions.  Rather, the parties dispute whether Plaintiffs suffered adverse employment actions, and if so, whether those adverse employment actions occurred under circumstances giving rise to an inference of discriminatory intent.  ECF No. 26 at 22–24.

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Vega v. Hempstead Union Free*

*Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015). Plaintiffs allege the adverse employment actions here included:

> (i) mandating removal of the Pride Flag; (ii) implementing a no-flag policy in response to the display of the Pride Flag; (iii) selectively enforcing its flag policy; (iv) being deliberately indifferent to the vandalism of pride stickers[;] and (v) placing burdens on plaintiff Ecke that were not placed on other teache[r]s who sent permission slips out.

ECF No. 41 at 22. These allegations fail to rise to the level of adverse employment actions. "To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004). "Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.*

None of Plaintiffs' claims come close to alleging that their job responsibilities were altered in any way—Plaintiffs were not terminated, demoted, or given diminished material responsibilities. To the extent Plaintiffs argue that a heavier burden was placed on them by having to remove the pride flags and stickers, and on Ecke by having to modify the permission slip for the GSA Trip, such actions do not rise to the level of workload that is "disproportionately heavy" to "constitute an adverse employment action." *Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 451–52 (S.D.N.Y. 2023) (finding allegations of increased workload did not constitute an adverse employment action). Although Plaintiffs may have preferred not to take down the flags and stickers, and Ecke did not wish to distribute the new permission slip, "simply being assigned undesirable work duties is insufficient to establish adverse employment action, since it does not have a material impact on the terms and conditions of [P]laintiffs['] employment." *Castro v. City of New York*, 24 F. Supp. 3d 250, 264 (E.D.N.Y.

9

2014).  Similarly, Defendants' enforcement of Policy 1310 and Defendants' response to the

vandalism of the flag stickers by a student are not actions that "materially change the terms and

conditions of [Plaintiffs'] employment."  *Cf. Vega*, 801 F.3d at 89 (assigning teacher excessively

noisy media center for one class, assigning teacher classroom with University of Puerto Rico

banner above door, deactivating his password for school computer, and unsuccessfully

attempting to transfer him were not adverse employment actions within the meaning of a

plausible discrimination claim under Title VII).  Indeed, the Amended Complaint does not allege

that as a result of Defendants' actions, Plaintiffs were "denied opportunities for career

advancement, or indeed that [they] suffered any career impediment whatsoever."  *Henry v.*

*N.Y.C. Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 405 (S.D.N.Y. 2014) (dismissing Title VII

discrimination claims).  Because the Court finds Defendants' actions do not rise to the level of

adverse employment actions, Plaintiffs' Title VII discrimination claim necessarily fails, and it is

therefore dismissed.

> B.    *Title VII – Discriminatory Notices*

Plaintiffs also allege Defendants published discriminatory notices in violation of 42

U.S.C. § 2000e-3(b).  ECF No. 14 ¶¶ 156–60.  Section 2000e-3(b) prohibits an employer from:

> Print[ing] or publish[ing] or caus[ing] to be printed or published any notice or
> advertisement relating to employment by any such employer . . . indicating any
> preference, limitation, specification, or discrimination, based on race, color,
> religion, sex, or national origin, except that such a notice or advertisement may
> indicate [such] a preference . . . when religion, sex, or national origin is a bona fide
> occupational qualification for employment.

Plaintiffs allege that the emails discussing actions in accordance with Policy 1310 constitute

"discriminatory notices" in violation of this section.  ECF No. 14 ¶ 158.  However, as

Defendants correctly point out, this section does not apply to these types of notices.  ECF No. 26

at 28–29.  Rather, the section has been interpreted to prohibit advertising a preference for job

*applicants*. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 356 (2013)

(Section 2000e-3(b) prohibits as an unlawful employment practice "advertising a preference for

applications of a particular race, color, religion, sex, or national origin."); *Cooper v. N.Y.S. Dep't

of Labor*, 819 F.3d 678, 681 (2d Cir. 2016) (Section 2000e-3(b) "enumerat[es] as an unlawful

employment practice the advertising of a preference for applicants based on race, color, religion,

sex, or national origin.").  Plaintiffs do not allege that the emails circulated were notices for

hiring job applicants.  Rather, the emails notify already-hired employees about the

implementation of the District Policies.  ECF Nos. 14-2, 14-3, 14-4, 14-5.  Notably, these notices

did not condition any employee's employment on the removal of the flags or stickers.  Nor did

the emails advertise an unlawful preference for a particular type of employee.  Accordingly, the

Court finds Plaintiffs have failed to state a claim under Section 2000e-3(b), and their

discriminatory notice claim under that section is therefore dismissed.

## II.    Federal Retaliation Claims

Title IX protects both employees and students at federally funded educational institutions.

*See N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530 (1982) ("The legislative history . . .

corroborates . . . [the] conclusion that employment discrimination comes within the prohibition

of Title IX.").  As part of its protections, Title IX "encompasses suits for retaliation, because

retaliation falls within the statute's prohibition of intentional discrimination on the basis of sex."

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 178 (2005).

Plaintiffs bring retaliation claims under Title VII and Title IX, which "are governed by

the same substantive standards . . . ."  *Summa v. Hofstra Univ.*, 708 F.3d 115, 131 (2d Cir. 2013).

These retaliation claims are also evaluated under the *McDonnell-Douglas* burden-shifting

analysis.  *Holcomb v. State Univ. of New York at Fredonia*, 698 F. App'x 30, 31 (2d Cir. 2017).

To state a *prima facie* case, Plaintiffs must show: "(1) participation in a protected activity; (2) that [Defendants] knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). Defendants argue that Plaintiffs' retaliation claims fail because (i) Plaintiffs did not participate in a protected activity, (ii) Plaintiffs did not suffer any adverse employment actions, and (iii) there was no inference of retaliatory animus. ECF No. 26 at 24–26, 29–30. Plaintiffs respond that they engaged in protected activities by invoking their "constitutional right to express themselves and personalize their classroom walls and doors" and by complaining about the District Policies. ECF No. 41 at 24–26. They further argue they suffered adverse employment actions through Defendants' actions of: (i) compelling Plaintiff Ecke to remove the progress flag and the pride flag; (ii) banning LGBT-related flags and symbols by enforcing Policy 1310; and (iii) imposing an extra burden on Ecke regarding permission slips. ECF No. 41 at 24.

For the reasons discussed later in this opinion, *see* infra § IV.A.ii, the Court has doubts as to whether the activities articulated here are protected activities since it is unclear what standard applies to a secondary school teacher's expressive speech in the classroom setting. However, the Court need not reach that issue because, even assuming *arguendo* that Plaintiffs' actions constituted protected activities, the Court finds Plaintiffs have not adequately alleged that they suffered any adverse employment action.

Unlike a discrimination claim, an adverse employment action "need not affect the terms and conditions of a plaintiff's employment for purposes of a retaliation claim." *Crosby v. Stew Leonard's Yonkers LLC*, 695 F. Supp. 3d 551, 572 (S.D.N.Y. 2023). Instead, an adverse employment action is "any action that could well dissuade a reasonable worker from making or

supporting a charge of discrimination." *Vega*, 801 F.3d at 90.  And, although the Court takes

into consideration that "[c]ontext matters" and "an act that would be immaterial in some

situations [may be] material in others," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53,

69 (2006), Plaintiffs must still show that they suffered "material adversity" because "Title VII

does not set forth a general civility code for the American workplace," *Hicks*, 593 F.3d at 165;

*see also Doe v. State Univ. of New York Purchase Coll.*, No. 21-cv-8417, 2024 WL 4266545, at

*11 (S.D.N.Y. Sept. 23, 2024) ("As a general matter, Title IX is not a general civility

code . . . .").

The Court finds that the actions alleged here—(i) compelling Plaintiff Ecke to remove the

progress flag and the pride flag, (ii) banning LGBT-related flags and symbols by enforcing

Policy 1310, and (iii) imposing an extra burden regarding permission slips on Ecke—do not

amount to actions that would dissuade another teacher from supporting a charge of

discrimination.  As an initial matter, Plaintiffs cite to no authority, nor is the Court aware of any,

that supports a conclusion that the aforementioned actions are "adverse" in the context of a

federal retaliation claim.  *See* ECF No. 41 at 24.  To the extent Plaintiffs are arguing that

Defendants' actions amounted to a modification of Plaintiffs' job duties, "reassignment of job

duties is not automatically considered a materially adverse employment action." *Vasquez v.

Yonkers Pub. Sch. Dist.*, No. 21-cv-4620, 2024 WL 1349227, at *6 (S.D.N.Y. Mar. 29, 2024)

(plaintiff's transfer and modified hours did not constitute adverse employment action), *aff'd,* No.

24-1220, 2025 WL 893368 (2d Cir. Mar. 24, 2025).  Indeed, courts in this Circuit have declined

to find much more rigorous modifications to job responsibilities, such as "transfers (or denials of

transfers) [to] amount to adverse employment actions, even in the context of a retaliation claim,

where the action results merely in an inconvenience, such as an increased commute or

13

unfavorable hours." *Id.*  Likewise, in *Freud v. New York City Department of Education*, plaintiff alleged defendants retaliated against him "by failing to inform him about an upcoming field trip, by requiring him to go directly through an assistant principal for the classroom supplies he needed, by delaying the delivery of iPads for his students, and by assigning him to teach a remote class during the COVID-19 pandemic inside the school building rather than from home." No. 22-879, 2023 WL 3103588, at *2 (2d Cir. Apr. 27, 2023).  The Second Circuit affirmed the district court's dismissal of the retaliation claims and held that defendants' actions did not amount to more than "minor annoyances that would not dissuade a reasonable worker from making or supporting a charge of discrimination . . . ." *Id.*

Similarly here, the Court cannot find that Defendants' actions rise to the level of retaliation as a matter of law.  Rather, they are similar to the type of actions the plaintiff faced in *Freud*, and are the type of "[p]etty slights or minor annoyances that often take place at work and that all employees experience [that] do not constitute actionable retaliation." *Hicks*, 593 F.3d at 165.  Accordingly, because the Court finds that Defendants' actions do not amount to actions that would dissuade another teacher from supporting a charge of discrimination, the Court finds Plaintiffs have failed to state a claim of retaliation under either Title VII or Title IX, and those claims are therefore dismissed.

### III.    Sex-Based Harassment Pursuant to Title IX

Defendants argue that Plaintiffs' Title IX hostile work environment claim should be dismissed because Plaintiffs have not met the Title VII threshold for alleging a hostile work environment.  ECF No. 26 at 30.  Plaintiffs have arguably abandoned this claim by failing to respond to that argument.  *See St. Francis Holdings, LLC v. MMP Cap., Inc.*, No. 20-cv-4636, 2022 WL 991980, at *16 (E.D.N.Y. Mar. 31, 2022) (plaintiffs abandoned civil conspiracy claim

where they did not address defendants' arguments to dismiss it); *BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 821 (S.D.N.Y. 2021) (Nathan, J.) ("Plaintiffs' failure to oppose Defendants' specific argument in a motion to dismiss is deemed waiver of that issue."), *aff'd*, No. 21-1097, 2022 WL 598973 (2d Cir. Mar. 1, 2022).  Although Plaintiffs refute Defendants' arguments about their hostile work environment claims brought under the state and county regulations, *see* ECF No. 41 at 28–29, Plaintiffs' opposition is silent about their Title IX claims.

Regardless, the Court agrees with Defendants that Plaintiffs have not plausibly stated a hostile work environment or sex-based harassment claim under Title IX.  As with Plaintiffs' discrimination and retaliation claims, their claims for sex-based harassment are "substantively similar to the claims brought under Title VII."  *Dikambi v. City Univ. of New York*, No. 19-cv-9937, 2021 WL 4198252, at *5 (S.D.N.Y. Sept. 14, 2021); *accord Summa*, 708 F.3d at 131.  To establish that they were subject to a hostile work environment, Plaintiffs must show "that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "The Second Circuit has held that 'proving the existence of a hostile work environment involves showing both objective and subjective elements:  the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.'"  *See LaFontant v. Mid-Hudson Forensic Psychiatric Ctr.*, No. 18-cv-23, 2023 WL 6610764, at *8 (S.D.N.Y. Oct. 10, 2023) (quoting *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004)); *see also Levarge v. Preston Bd. of Educ.*, 552 F. Supp. 2d 248, 254 (D. Conn. 2008) (hostile educational environment claim "requires evidence not only that the victim subjectively perceived

the environment to be hostile or abusive, but also that the environment was objectively hostile and abusive, that is, that it was permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's educational environment").

Plaintiffs' allegations do not meet the "severe and pervasive" threshold needed to state a hostile work environment claim.  Plaintiffs allege they were subject to sex-based harassment by virtue of the District Policies, and that Plaintiff Ecke was further subject to harassment by the increased burden of implementing and distributing the modified permission slip for the GSA Trip.  ECF No. 14 ¶ 165.  But under Title VII, "[i]ncidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'"  *LaFontant*, 2023 WL 6610764, at *8 (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)). Plaintiffs' allegations fall well short of being sufficiently continuous and concerted.  Although Plaintiffs may have been offended by Defendants' conduct, "[h]ostile work environment claims are meant to protect individuals from abuse and trauma that is severe[,] but are not intended to promote or enforce civility, gentility or even decency."  *Maron v. Legal Aid Soc'y*, 605 F. Supp. 3d 547, 561 (S.D.N.Y. 2022).  The Court finds Plaintiffs' allegations to be too isolated and sporadic to rise to the level of a hostile work environment claim.  Plaintiffs' hostile work environment claim under Title IX is therefore dismissed.

## IV. Constitutional Claims

Section 1983 provides a cause of action for damages to a person whose federal rights were violated by state or local officials.  *See* 42 U.S.C. § 1983.  "The conduct at issue must have been committed by a person acting under color of state law and must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States."

*Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010).  "A state employee acting in his official capacity is acting under color of state law."  *Vega*, 801 F.3d at 88.  Public school employees who have input into personnel decisions also act "under color of state law."  *Boncoeur v. Haverstraw-Stony Point Cent. Sch. Dist.*, No. 20-cv-10923, 2022 WL 845770, at *5 (S.D.N.Y. Mar. 22, 2022).

Plaintiffs allege Defendants violated their First Amendment right to free speech and Fourteenth Amendment right to equal protection of the law.  For the reasons set forth below, the Court finds that dismissal is warranted as to both of these claims.

### A.    First Amendment Claims

"[T]he First Amendment's protections extend to teachers and students, neither of whom shed their constitutional rights to freedom of speech or discretion at the schoolhouse gate." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022).  However, the speech rights of teachers as public employees are not so "boundless that they may deliver any message to anyone anytime they wish."  *Id.*  This is because "teachers . . . are also government employees paid in part to speak on the government's behalf and convey its intended messages."  *Id.*

Plaintiffs allege their First Amendment rights were violated in two ways.  First, they allege that Defendants engaged in viewpoint discrimination by enforcing the District Policies, which "deprived Plaintiffs of their freedom of speech on the walls and doors of classroom and other school facilities in which [the] District had created a limited public forum for analogous forms of speech."  ECF No. 14 ¶ 181; *see also id.* ¶ 177.  Second, Plaintiffs allege Defendants retaliated against them for "engaging in protected speech."  *Id.* ¶¶ 192, 195.

i.      <u>Retaliation</u>

The Court addresses Plaintiffs' retaliation claim first.  "To establish First Amendment retaliation by a government actor, the plaintiff must demonstrate that (1) his or her speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him or her; and (3) there was a causal connection between this adverse action and the protected speech."  *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 94 (2d Cir. 2020).  Putting aside whether Plaintiffs' speech was protected by the First Amendment, the Court finds, as it has throughout this opinion, that Plaintiffs have not suffered any adverse action to sustain a First Amendment retaliation claim.  "Courts in this Circuit apply in First Amendment retaliation cases a standard substantially similar to the one. . . for Title VII retaliation cases, considering whether the retaliation well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Forman v. N.Y.C. Dep't of Educ.*, No. 19-cv-8156, 2022 WL 912130, at *9 (S.D.N.Y. Mar. 29, 2022); *see also Manon v. Pons*, 131 F. Supp. 3d 219, 232 n.8 (S.D.N.Y. 2015) ("The standard for an 'adverse action' in the context of First Amendment retaliation is substantially similar to the same inquiry in the Title VII retaliation context.").  The adverse actions alleged by Plaintiffs in this context are the same adverse actions Plaintiffs alleged in the Title IX and Title VII retaliation contexts, *see* ECF No. 14 ¶¶ 150–51, 155, 194–95, 205; namely, that Defendants enforced the District Policies and Plaintiff Ecke was required to implement the modified permission slip for the GSA Trip.  For the same reasons the Court found that these alleged adverse actions were insufficient to withstand retaliation claims under Title IX and Title VII, the Court also finds here that the allegations are insufficient to withstand a First Amendment retaliation claim.

ii.    Viewpoint Discrimination

"Viewpoint discrimination is a subset or particular instance of the more general phenomenon of content discrimination, in which the government targets not subject matter but particular views taken by speakers on a subject." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 31 (2d Cir. 2018). "The government discriminates against viewpoints when it disfavors certain speech because of the specific motivating ideology or the opinion or perspective of the speaker." *Id.* "A public employee, however, must 'by necessity . . . accept certain limitations on his or her freedom,' because, his or her speech can 'contravene governmental policies or impair the proper performance of governmental functions.'" *Weintraub v. Bd. of Educ. of City of New York*, 593 F.3d 196, 201 (2d Cir. 2010) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418–19 (2006)). And with respect to teachers, their First Amendment rights must be "applied in light of the special characteristics of the school environment . . . ." *Tinker v. Des Moines Ind. Comm. Sch. Dist.*, 393 U.S. 503, 506 (1969).

## 1.    The Relevant Standards

The parties dispute what standard applies to the speech at issue in this case. This is not surprising as different standards have been applied to speech made by educators in different contexts. *See Byrd v. Middletown Bd. of Educ.*, No. 24-cv-207, 2024 WL 4871885, at *5 (D. Conn. Nov. 22, 2024) ("The Second Circuit has applied three different standards to speech made by educators in different contexts, and has no holdings determining what rule applies to the type of speech here."); *Lee-Walker v. N.Y.C. Dep't of Educ.*, 220 F. Supp. 3d 484, 491 (S.D.N.Y. 2016) ("It . . . remains an open question in this Circuit whether *Garcetti* applies to classroom instruction.").

In *Garcetti v. Ceballos*, the Supreme Court clarified that in order to bring a First Amendment violation claim, a public employee must first establish that the employee spoke "as a citizen on a matter of public concern." 547 U.S. at 418. If the employee was not speaking as a citizen on a matter of public concern, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* Employees do not speak as citizens for First Amendment purposes "when public employees make statements pursuant to their official duties . . . ." *Id.* at 421. On the other hand, if the employee was speaking as a citizen on a matter of public concern, "[t]he question becomes whether the relevant government entity had adequate justification for treating the employee differently from any other member of the general public." *Id.* at 418.

*Garcetti* involved a retaliation claim by a deputy district attorney who had written a memorandum concerning potential misrepresentations contained in an affidavit that was used to obtain a search warrant. 547 U.S. at 413–14. The Supreme Court determined that the memo was written pursuant to the deputy district attorney's official duties, and therefore his speech was not protected by the First Amendment. *Id.* at 424. Justice Souter, in his dissent in *Garcetti*, expressed concerns about what effect the decision would have on teachers and professors. *Id.* at 438 (Souter, J., dissenting) ("I have to hope that today's majority does not mean to imperil First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write pursuant to . . . official duties."). In response, the majority clarified that the decision's reasoning did not extend to academic scholarship or classroom instruction. *Id.* at 425 ("We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching."). The Supreme Court and the Second Circuit have applied *Garcetti* to a school employee's speech

made outside of the classroom.  *See Kennedy*, 597 U.S. 507 (applying *Garcetti* to coach's private

speech at football game); *Weintraub*, 593 F.3d 196 (applying *Garcetti* to teacher who filed

formal grievance with his union).  Nevertheless, "[i]t . . . remains an open question in this Circuit

whether *Garcetti* applies to classroom instruction."  *Lee-Walker*, 220 F. Supp. 3d at 491; *see also*

*Byrd*, 2024 WL 4871885, at *5.

       The Second Circuit has likewise applied the standards articulated in *Hazelwood School*

*District v. Kulmeier*, 484 U.S. 260 (1988), and *Tinker v. Des Moines Independent Community*

*School District*, 393 U.S. 503 (1969), to assess whether the censorship of speech in school is

constitutionally permissible.  *See Collins v. Putt*, 979 F.3d 128, 132 (2d Cir. 2020); *see also*

*Silano v. Sag Harbor Union Free Sch. Dist.*, 42 F.3d 719, 723 (2d Cir. 1994) (applying

*Hazelwood* to speech made by guest speaker in a public high school).  If the speech constitutes a

"school-sponsored expressive activity, then the deferential standard announced in *Hazelwood*

applies."  *Collins*, 979 F.3d at 132.  Whether speech is school-sponsored depends "on whether

students, parents, and members of the public might reasonably perceive the speech to bear the

imprimatur of the school."  *Id.* at 132–33.  School-sponsored speech may be regulated so long as

the regulations "are reasonably related to legitimate pedagogical concerns."  *Hazelwood*, 484

U.S. at 273.  This is based on the recognition that "the determination of what manner of speech

in the classroom . . . is inappropriate properly rests with the school . . . rather than with the

federal courts."  *Id.* at 267.  On the other hand, if the speech represents personal expression that

happens to occur on school premises, then the standard announced in *Tinker* applies.  *Collins*,

979 F.3d 133.  Under *Tinker*, school officials may regulate non-school-sponsored speech if the

speech "would materially and substantially disrupt classwork and discipline in the school."  *Id.*

### 2.    Qualified Immunity

Regardless of the standard applied, however, the individual Defendants are entitled to qualified immunity with respect to the First Amendment viewpoint discrimination claim.  *See Byrd*, 2024 WL 4871885, at *4–5; *Lee-Walker*, 220 F. Supp. 3d at 494–95.  Employees are entitled to qualified immunity from civil liability under Section 1983 if either (1) their conduct did not violate clearly established rights of which a reasonable person would have known or (2) it was objectively reasonable to believe that their acts did not violate these clearly established rights.  *Cornejo v. Bell*, 592 F.3d 121, 128 (2d Cir. 2010).  The individual Defendants in this case argue that their actions are entitled to qualified immunity because their conduct did not violate clearly established rights.  The Court agrees.

"A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022).  Although it is not required that there be "a case directly on point to hold that a defendant's conduct violated a clearly established right, existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.* at 739.  As discussed previously, *see* supra § IV.A.ii.1, it is not clear what standard applies to the facts in this case as neither the Supreme Court nor the Second Circuit has decided which test would apply to a secondary school teacher's expressive speech in the classroom setting.  *Cf. Byrd*, 2024 WL 4871885, at *4–5 (qualified immunity applied where the Second Circuit had not decided which test applied "when a primary or secondary school teacher is speaking allegedly pursuant to a district's curriculum"); *Lee-Walker*, 220 F. Supp. 3d at 494 (qualified immunity applied because "[f]ollowing *Garcetti*, it remains an open question whether that case's standard applies to classroom instruction").  Qualified immunity is therefore warranted because "no

decision . . . would put every reasonable official on notice that the conduct alleged violated a

teacher's First Amendment rights." *Byrd*, 2024 WL 4871885, at *6. Accordingly, Plaintiffs'

First Amendment viewpoint discrimination claim is dismissed.

        B.     *Fourteenth Amendment – Equal Protection*

      The Equal Protection Clause of the Fourteenth Amendment requires that the "government

treat all similarly situated people alike." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494,

499 (2d Cir. 2001). "Section 1983 and the Equal Protection Clause protect public employees

from various forms of discrimination, including . . . disparate treatment, on the basis of" a

protected characteristic. *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006). Plaintiffs

allege Defendants violated the Equal Protection Clause in three ways: "(1) Defendants[] denied

Plaintiffs the same rights and privileges the other faculty received; (2) Defendants selectively

enforced the ban against [Plaintiffs] and not others; and (3) Defendants retaliated against them

for their opposition to discrimination." ECF No. 41 at 17.

        i.     <u>Retaliation</u>

      The Court dismisses Plaintiffs' retaliation claim under the Equal Protection Clause

because it is nothing more than a restatement of Plaintiffs' First Amendment retaliation claim.

"Courts in the Second Circuit have dismissed equal-protection claims that merely restate First

Amendment retaliation claims." *Best Payphones, Inc. v. Dobrin*, 410 F. Supp. 3d 457, 484

(E.D.N.Y. 2019) (citing cases); *see also Schulz v. Commack Union Free Sch. Dist.*, 664 F. Supp.

3d 296, 310 (E.D.N.Y. 2023) ("When a plaintiff is attempting to assert an equal protection claim

based upon retaliation for First Amendment activity such a claim is completely duplicative of the

First Amendment retaliation claim and, therefore, should not go forward."). Here, Plaintiffs are

claiming Defendants retaliated against them by virtue of implementing the District Policies and

burdening Plaintiff Ecke with a more robust permission slip, and that their motivation was "to inhibit or punish Plaintiffs from exercising their constitutional right to freedom of speech." ECF No. 14 ¶ 210. Because these are the same allegations that underly Plaintiffs' First Amendment retaliation claim, they are dismissed as duplicative.

ii.    Selective Enforcement

Plaintiffs' remaining claims under the Equal Protection Clause are brought pursuant to a selective enforcement theory. *See* ECF No. 41 at 17–18. "It is well-settled that to establish an equal protection violation on a claim of selective enforcement, the plaintiff must satisfy a two-prong test and prove that (1) the plaintiff, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *J.E. ex rel. Edwards v. Ctr. Moriches Union Free Sch. Dist.*, 898 F. Supp. 2d 516, 547 (E.D.N.Y. 2012); *see also Foy v. New York State Unified Ct. Sys.*, 740 F. Supp. 3d 136, 152 (E.D.N.Y. 2024) ("For a public employee to plead a constitutional equal protection claim, he or she must allege the existence of a similarly situated member of an unprotected class who was treated differently from how the plaintiff was treated."). "[S]exual orientation has been held to be a basis for an equal protection claim under Section 1983." *Holden v. Port Auth. of N.Y. & N.J.*, 521 F. Supp. 3d 415, 431 (S.D.N.Y. 2021).

"When evaluating an equal protection . . . claim . . . the first question that must be asked is whether the plaintiff has proffered a sufficient comparator." *Hu v. City of New York*, No. 17-cv-2348, 2022 WL 182360, at *9 (E.D.N.Y. Jan. 20, 2022), *aff'd,* No. 22-cv-183, 2023 WL 3563039 (2d Cir. May 19, 2023). "[T]he plaintiff's and comparator's circumstances must bear a reasonably close resemblance," but "[t]hey need not, however, be identical." *Hu v. City of New*

*York*, 927 F.3d 81, 96 (2d Cir. 2019). "A plaintiff can prevail by showing that she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Id.*

Plaintiffs allege, as comparators, that the following categories of speech were not similarly restricted:

    a. Painted depictions of various flags were permitted, and even encouraged, in the Connetquot High School parking lot, including, but not limited to the Blue Lives Matter flag, a Mexican flag or a derivative of the same, a derivative of the American flag that included the year "1776," and a neo-Nazi / neo-confederate flag;

    b. The French flag that hung in the French classroom;

    c. The acronym "MAGA," representing . . . President Donald Trump's campaign slogan "Make America Great Again," painted in the Connetquot High School parking lot;

    d. Stickers displayed on classroom doors and school bulletins supporting such organizations as Students Against Drunk Driving, and Anti-Bullying Club;

    e. Professional sports team flags, such as the New York Rangers;

    f. A Prominent 9/11 Memorial display in the Oakdale Bohemia Middle School;

    g. Religious jewelry, such as Christian Crucifix worn by teachers, students, administrators, and/or other Connetquot Central School District employees.

ECF No. 14 ¶ 106. The Court has concerns about whether these comparators are "similarly situated in all material respects." First, it is unclear whether the "speakers" in many of the listed categories were teachers like Plaintiffs. For example, the Amended Complaint does not indicate who the speakers are with respect to the paintings in the parking lot, the stickers displayed on classroom doors, school bulletins, the professional sports team flags, and the prominent 9/11 memorial.[6] With respect to the jewelry worn by students, teachers, and other District employees,

---

[6] With respect to the professional sports team flag, the Amended Complaint alleges that Defendants did not restrict the display of professional sports team flags, but the Amended Complaint does not allege *who* exactly displayed that flag or *where* the flag was displayed. ECF No. 14 ¶¶ 106(e), 231. Although the Amended Complaint states that "other employees enjoyed the benefit of hanging . . . sports flags . . ." *id.* ¶ 231, that allegation does not indicate whether the employee was a teacher or whether the flags were hung in a classroom. In their opposition to Defendants' motion, Plaintiffs allege that sports flags were hung by a social studies teacher. ECF No. 41 at 7. The Court agrees with Defendants that it cannot consider these new facts because "[f]acts and allegations raised for the first time in opposition papers are not properly considered on a motion to dismiss . . . ." *Zucker v. HSBC Bank, USA*, No. 17-cv-2192, 2019 WL

that type of expressive speech on the person is arguably different than speech that is publicly displayed on classroom doors and classroom walls.  And finally, with respect to the French flag displayed in the French classroom—that type of flag was explicitly permitted under the District Policies.  ECF No. 14-4 at 1 ("Flags that support your curriculum can remain up (i.e. Italian Flag in Italian Class).").

As highlighted above, the Court has concerns with whether the comparators listed by Plaintiffs are proper comparators for this analysis.  However, the Court is mindful that the question of "whether parties are similarly situated is generally a fact-intensive inquiry that depends heavily on the particular context of the case at hand," and because of this, the Second Circuit has "cautioned against deciding whether two comparators are similarly situated on a motion to dismiss."  *Hu*, 927 F.3d at 97.  Accordingly, the Court does not reach this issue.  Nevertheless, the Court finds that Plaintiffs' claim fails because, even assuming *arguendo* that Plaintiffs were similarly situated to their alleged comparators in all material respects, Plaintiffs have not sufficiently alleged the second prong of the selective enforcement analysis—that the alleged selective treatment was based on impermissible considerations.

Plaintiffs' selective enforcement claim is fatally flawed because the Amended Complaint is devoid of non-conclusory factual allegations that would allow the Court to infer that Defendants implemented the District Policies *because of* Plaintiffs' sexual orientation or for other impermissible motivations such as malice or ill will.  Under this second element, Plaintiffs must allege that "the disparate treatment was *caused by* the impermissible motivation."  *Anderson v. City of New York*, 817 F. Supp. 2d 77, 94–95 (E.D.N.Y. 2011) (emphasis in original).  The facts do not support that.  First, in one of the emails attached to the Amended

2903694, at *3 (E.D.N.Y. June 27, 2019).  The Court therefore does not consider these new allegations in deciding this motion.

Complaint, Defendant Adams explains that the District Policies were being implemented because a student reported feeling uncomfortable about the pride progress flag. ECF No. 14-3 at 1. The email says nothing about the District Policies being implemented *because of* the Plaintiffs' sexual orientation. *Id.* Second, Adams explained that the District Policies were being enforced under previously-existing "Policy 1310," which dictates that school employees "shall not engage in political activities on school premises." *Id.* Further weakening any claim that Defendants acted with malice or ill will was their offer for Plaintiff Ecke to hang a sign that said, "This is a safe space to be who you are," and Defendant Adams' reiteration that all of the students "deserve a school where they are safe, comfortable and respected, regardless of what gender, religion, sexual orientation or political affiliation they espouse to." *Id.*

By attaching this email to the Amended Complaint, Plaintiffs plead too much and essentially plead themselves "out of court." *See VanBrocklen v. United States*, No. 08-cv-312, 2009 WL 819382, at *4 (N.D.N.Y. Mar. 26, 2009) ("[W]hile a plaintiff need only plead enough to put a defendant on notice of a plausible claim to survive a motion to dismiss, a plaintiff who pleads too much runs the risk of pleading himself out of court."), *on reconsideration in part,* 2010 WL 1372321 (N.D.N.Y. Apr. 7, 2010), *aff'd,* 410 F. App'x 378 (2d Cir. 2011); *Soto v. Disney Severance Pay Plan*, 26 F.4th 114, 120 (2d Cir. 2022) ("[W]e must dismiss a claim if a plaintiff plead[s] himself out of court by alleging facts which show that he has no claim."). Because the Amended Complaint is devoid of any facts suggesting malice, and in fact, suggests the opposite, Plaintiffs' equal protection claim based on selective enforcement must be dismissed. *See Lilakos v. New York City*, 808 F. App'x 4, 8 (2d Cir. 2020) (affirming dismissal of equal protection claim where complaint lacked allegations suggesting malice).

27

### V.    Monell Liability

Plaintiffs also bring a claim for *Monell* liability against the District and Board.  ECF No. 14 ¶¶ 214 –22; ECF No. 41 at 26–27.  "To succeed on a *Monell* claim, [P]laintiffs must demonstrate that a policy or custom of the [municipality] caused a deprivation of their federal or constitutional rights." *Nixon v. City of New York*, 668 F. Supp. 3d 143, 152 (E.D.N.Y. 2023); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978) (holding that a local government can only be sued under Section 1983 when execution of a government's policy or custom causes injury); *Frank v. Sachem Sch. Dist.*, 84 F. Supp. 3d 172, 193 (E.D.N.Y. 2015) ("[S]chool districts . . . are considered to be local governments and are subject to the same standards of liability as local governments under *Monell.*"), *aff'd,* 633 F. App'x 14 (2d Cir. 2016).  The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right.  *Agosto*, 982 F.3d at 97.

"It is well-settled that a *Monell* claim cannot succeed without an underlying constitutional violation." *Mastromonaco v. Cnty. of Westchester*, 779 F. App'x 49, 51 (2d Cir. 2019); *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (finding that a district court does not need to address *Monell* liability if it finds no underlying constitutional violation).  Applying this standard, the Court need not consider Plaintiffs' *Monell* claims.  Because the Court concludes, *see* supra § IV, that Plaintiffs' constitutional claims brought pursuant to Section 1983 fail, it follows that there can be no *Monell* liability with respect to those claims.  *Grytsyk v. Morales*, 527 F. Supp. 3d 639, 658 (S.D.N.Y. 2021) ("Because the Court concluded above that [plaintiff's Section 1983] claims fail, it follows that there can be no municipal liability with respect to these claims.").  The Court therefore dismisses the *Monell* liability claim.

## VI.    State and County Claims

The Court may decline to exercise supplemental jurisdiction over state law claims where all claims over which it had original jurisdiction have been dismissed.  *See* 28 U.S.C. § 1367(c)(3).  When "all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction . . . ."  *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 81 (2d Cir. 2018).  To determine whether it is proper to decline to hear the state law claims, courts balance "judicial economy, convenience, fairness, and comity."  *Id.*  "In the context of employment discrimination cases, courts . . . routinely decline to exercise supplemental jurisdiction over state- and city-law claims when the federal claims have been dismissed."  *Munck v. Simons Found.*, No. 23-cv-9188, 2024 WL 4307776, at *9 (S.D.N.Y. Sept. 26, 2024).

Furthermore, courts may decline to exercise supplemental jurisdiction over claims that present novel or complex issues of state law.  *See* 28 U.S.C. § 1367(c)(1).  Here, the parties dispute whether this Court has jurisdiction to hear the claims brought pursuant to the Suffolk County Human Rights Law ("SCHRL"), or whether jurisdiction rests solely with the Suffolk County Human Rights Commission, *see* ECF No. 26 at 30–31; ECF No. 41 at 28 n.4, and this territory appears to be uncharted by both state and federal courts.  Additionally, courts may decline to retain the state law claims where the claims are subject to different standards than the federal claims.  *Hansen v. City of New York*, No. 24-cv-2808, 2025 WL 588119, at *9 (S.D.N.Y. Feb. 24, 2025) ("[T]he Court declines to exercise supplemental jurisdiction over [plaintiff's] other state and local claims because they are subject to different standards and must be analyzed

separately.").  Here, at a minimum, some of the New York State Human Rights Law

("NYSHRL") claims would be analyzed under a different standard than the federal claims.[7]

Because the Court has dismissed all federal claims in this case, and because the

remaining state law claims would be analyzed under different and developing standards, the

Court finds it to be in the interest of judicial economy to decline to exercise supplemental

jurisdiction over all state law claims.

### VII.    Leave to Amend

"A court should freely give leave when justice so requires, but it may, in its discretion,

deny leave to amend for good reason, including futility, bad faith, undue delay, or undue

prejudice to the opposing party."  *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66

F.4th 77, 90–91 (2d Cir. 2023) (affirming denial of leave to amend).  Plaintiffs do not seek leave

to amend their complaint for a second time, and on that basis alone, the Court need not grant it.

*See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff need not

be given leave to amend if it fails to specify . . . to the district court  . . . how amendment would

cure the pleading deficiencies in its complaint.").  Indeed, Plaintiffs have "already amended

[their] complaint once and provided the . . . [C]ourt with no new facts in support of  . . . [any]

request for leave to amend . . . ."  *Zappia v. Myovant Scis. Ltd.*, No. 24-253-cv, 2025 WL

---

[7]      Historically, the NYSHRL's liability standard was coextensive with Title VII's, but
recent amendments to the statute set it at a level either "identical" to or at least "closer" to the
New York City Human Rights Law ("NYCHRL").  *See Yost v. Everyrealm, Inc.*, 657 F. Supp.
3d 563, 578 (S.D.N.Y. 2023).  In June of 2019, New York State amended the NYSHRL, "the
effect of which is to render the standard for claims brought under the NYSHRL closer to the
standard under the [NYCHRL]."  *Passante v. Cambium Learning Grp.*, No. 23-cv-4060, 2024
WL 4171026, at *5 (E.D.N.Y. Sept. 12, 2024).  Accordingly, "NYSHRL discrimination claims
accrued after August 12, 2019, must be construed liberally for the accomplishment of the
remedial purpose of the law and should now be interpreted as rendering a standard for claims
closer to the standard of the NYCHRL."  *Meckeler v. Cornell Univ.*, No. 23-cv-773, 2024 WL
3535488, at *5 (N.D.N.Y. July 25, 2024).

338351, at *4 (2d Cir. Jan. 30, 2025).  Because Plaintiffs have "failed to specify to the . . .

[C]ourt . . . how amendment would cure the pleadings deficient in [their] complaint," *see id.* at

*5, the Court declines to grant leave to amend.

<u>**CONCLUSION**</u>

For the reasons set forth above, the Court grants Defendants' motion to dismiss, *see* ECF

No. 26, and Plaintiffs' claims under federal law are dismissed with prejudice.  The Court

declines to exercise supplemental jurisdiction over Plaintiffs' state law claims, and those claims

are dismissed without prejudice.  The Clerk of Court is respectfully directed to enter judgment

and close the case.


SO ORDERED.

*/s/ Hector Gonzalez*
   HECTOR GONZALEZ
   United States District Judge


Dated:  Brooklyn, New York
      April 9, 2025